UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| BEDESCHI AMERICA, INC.,<br><br>       Plaintiff,<br><br>       v.<br><br>AGRI SYSTEMS, INC. d/b/a ASI INDUSTRIAL,<br><br>       Defendant. | No. 3:14cv00351(MPS) |

# MEMORANDUM AND ORDER

Plaintiff, Bedeschi America, Inc. ("Bedeschi"), brought a complaint against Defendant, Agri Systems, Inc. d/b/a ASI Industrial ("ASI"), for breach of contract (Count One), unjust enrichment (Count Two), fraud (Count Three), and violations of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a *et seq*. (the "CUTPA") (Count Four). (Complaint ("Compl.") ECF No. 1.) Bedeschi claims that ASI has failed to pay the full amount due for Bedeschi's manufacture and delivery of certain equipment to be used at a power plant in Plainfield, Connecticut. Bedeschi has moved for summary judgment on Counts One and Four. (ECF No. 49.) Because there are genuine factual disputes about which payment terms the parties agreed to and about whether ASI breached those terms, the Court DENIES Plaintiff's motion.

**I.     BACKGROUND**

   **A.     The Facts**[1]

---

[1] Unless otherwise noted, the following facts are undisputed, and recounted in the light most favorable to the nonmovant, drawing all reasonable inferences in favor of the nonmovant. *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

Bedeschi is a Florida corporation with its principal place of business in Deerfield Beach, Florida. (Plaintiff's Local Rule 56(a)1 Statement, ECF No. 51 ("Pl.'s L.R. 56(a)1 Stmt.") ¶ 1.) ASI is a Montana corporation with its principal place of business in Billings, Montana. (Pl.'s L.R. 56(a)1 Stmt. ¶ 2; Defendant's Local Rule 56(a)2 Statement, ECF No. 59 ("Def.'s L.R. 56(a)2 Stmt.") ¶ 2.) Bedeschi's business involves "manufacturing and selling equipment to be used for bulk handling, heavy clay, and crushing." (Pl.'s L.R. 56(a)1 Stmt. ¶ 4; Def.'s L.R. 56(a)2 Stmt. ¶ 4.) ASI manages agricultural and industrial projects and offers services such as "drafting and civil engineering; steel fabrication; and materials purchasing." (Pl.'s L.R. 56(a)1 Stmt. ¶ 5; Def.'s L.R. 56(a)2 Stmt. ¶ 5.) Robert Hamlin is the Chief Executive Officer of ASI, and Thomas Turano is the Vice President of Bedeschi. (Compl., ECF No. 1 ¶ 25.)

In December 2011, Leidos Constructors, LLC ("Leidos") and ASI entered into a written subcontract agreement under which ASI agreed to design, detail, fabricate, furnish, and deliver certain equipment to Leidos for use in a new biomass power plant located in Plainfield, Connecticut (the "Plant"). (Pl.'s L.R. 56(a)1 Stmt. ¶ 7; Def.'s L.R. 56(a)2 Stmt. ¶ 7.) Also in late 2011, ASI and Bedeschi began negotiations related to Bedeschi's manufacturing—and ASI's purchasing—of an "Overhead Ripper" and a "Portal Reclaimer" (the "Equipment") to be used for "biomass stacking, storage, and reclaiming" at the Plant. (Pl.'s L.R. 56(a)1 Stmt. ¶ 6; Def.'s L.R. 56(a)2 Stmt. ¶ 6.)

Bedeschi sent ASI a "written offer" regarding the purchase of the Equipment, dated January 12, 2012, and labeled "KC-69 rev02 AS SOLD" (the "AS SOLD offer"). Bedeschi drafted the AS SOLD offer "based upon specifications for manufacturing the Equipment" provided by ASI. (Pl.'s L.R. 56(a)1 Stmt. ¶ 8; Def.'s L.R. 56(a)2 Stmt. ¶ 8.) The AS SOLD offer included certain "Sales Conditions" (Pl.'s L.R. 56(a)1 Stmt. ¶ 9; Def.'s L.R. 56(a)2 Stmt. ¶ 9) on

pages 19 through 21. One of the Sales Conditions was the "Price Summary," which showed the prices ASI would pay Bedeschi for the Equipment and listed the total price as $1,000,000 (the "Purchase Price"). (Pl.'s L.R. 56(a)1 Stmt. ¶ 10; Def.'s L.R. 56(a)2 Stmt. ¶ 10.) The "Payment" Sales Condition required that ASI "pay 10% of the Purchase Price upon submission of a purchase order, 10% of the Purchase Price upon Bedeschi's delivery of certain certified drawings, and 80% of the Purchase Price upon delivery" of the Equipment to the Plant (the "10%-10%-80% payment provision"). (Pl.'s L.R. 56(a)1 Stmt. ¶ 11; Def.'s L.R. 56(a)2 Stmt. ¶ 11.) The "delivery time" Sales Condition required that the Equipment be delivered to the Plant by the week of November 18, 2012. (Pl.'s L.R. 56(a)1 Stmt. ¶ 12; Def.'s L.R. 56(a)2 Stmt. ¶ 12.)

Bedeschi states that ASI received and accepted the AS SOLD offer on January 12, 2012, and issued Purchase Order #3448 (the "Purchase Order") incorporating the terms of the AS SOLD Offer. (Pl.'s L.R. 56(a)1 Stmt. ¶¶ 13-14.) ASI notes that it did not sign the AS SOLD offer and denies that it accepted the offer. Instead, ASI asserts that it issued the Purchase Order as a counter offer. (Def.'s L.R. 56(a)2 Stmt. ¶¶ 13-14.) "[A]lthough ASI admits that the Purchase Order did incorporate the materials, equipment[,] and/or services described in the AS SOLD offer, it denies that it accepted any other terms." (Def.'s L.R. 56(a)2 Stmt. ¶ 14.) The Purchase Order states that quote number, "KC-69 rev02 pg. 1-18," forms a part of the Purchase Order. According to ASI, the "KC-69 rev02 pg. 1-18" refers to the first 18 pages of the AS SOLD offer, which excludes the Sales Conditions that appear on pages 19 through 21. (*See* Def.'s Ex. B, ECF No. 59-2 at 2; ECF No. 52, Affidavit of Thomas Turano ("Turano Aff.") Ex. A.)

On January 12, 2012, both parties signed the first page of the Purchase Order beneath the following statements: "[t]his Purchase Order is subject to the terms and conditions on the next (3) pages, which are hereby incorporated herein. Seller's acceptance is limited to the terms and

3

conditions of this Purchase Order." (Def.'s Ex. B, ECF No. 59-2 at 2.) The Purchase Order contained several pages of terms and conditions, including the following:

> 2. COMPLETE AGREEMENT – This Purchase Order is the complete agreement between Buyer and Seller and all referenced documents, drawings and specifications from the Prime Contract (the Contract between Owner and Buyer or Buyer's successor-in-interest) are incorporated as part of this order. Seller's acceptance is expressly limited to the terms thereof and is effected by signing and returning a copy of this order, or by commencing work or making shipment or delivery.  Buyer expressly rejects any additional or different terms or conditions proffered by Supplier in any prior or future acknowledgment, invoice or other document. Buyer shall be bound only by the terms of this Purchase Order.
> . . .
> 7. INSPECTION – All shipments shall be subject to final inspection by Buyer after receipt by Buyer at the project or designated location.  Buyer shall have the right to reject and refuse acceptance of materials, equipment, goods and associated work that are not in accordance with specifications, addenda, drawings or other data or Seller's warranty (express or implied).  Buyer may deduct from any amount owed to Seller under this Purchase Order the cost of inspecting goods or services rejected. Materials, equipment or goods not accepted shall, at Buyers option be . . . (b) held by Buyer at Seller's expense; (c) held by Buyer for an equitable reduction in price; (d) repaired by Buyer at Seller's expense.  Payment for any materials, equipment, goods or associated work shall not constitute acceptance.
> . . .
> 10. WARRANTY -  In addition to any warranty in fact or implied by law, Seller hereby expressly warrants that the materials, equipment, goods and associated work provided under this Purchase Order shall: (a) satisfy the terms of this Purchase Order and the Contract Documents: (b) be free from all defects, and of the kind, quantity and quality specified, or, if no quality is specified, then of the best grade of their kind; (c) be new, merchantable, and fit for the purpose intended; . . . and (e) be covered by all warranties implied by law or usage of trade.
> . . .
> 12. PAYMENT – Payment shall be made by Buyer only after (a) receipt by Buyer of the executed copy of this Purchase Order, (b) inspection and acceptance of the materials, equipment work or goods, (c) receipt of Seller's invoice, (d) receipt, if and when requested by Buyer, of affidavits that all of Seller's suppliers have been paid, and of release of all liens either by Seller or Seller's supplier(s) and claims executed by to [sic] Buyer in a form suitable to Buyer, and (e) receipt by Buyer of copies of warranties, applicable manuals and all other close-out documents required for the materials or equipment. Upon fulfillment of above, ASI shall pay approved items within 30 days of receipt of invoice.
> . . .

> 14. INDEMNITY - . . .  Seller shall indemnify and hold harmless Buyer from any costs arising out of a breach of warranty or incurred in connection with the enforcement of warranty under Article 10.  To the fullest extent permitted by law, Seller shall defend, indemnify and hold harmless Buyer and its agents, consultants, members, employees and others as required by this Purchase Order from and against any and all claims or damages they may incur due to Seller's failure to provide timely performance in accordance with this Purchase Order.

(Def.'s Ex. B, ECF No. 59-2 at 3-5.)

The parties agree that ASI made the first two payments—each 10% of the Purchase Price—in accordance with the schedule set forth in the "Payment" Sales Conditions in the AS SOLD offer. (Pl.'s L.R. 56(a)1 Stmt. ¶ 16; Def.'s L.R. 56(a)2 Stmt. ¶ 16.) Bedeschi delivered the Equipment to ASI on September 15, 2013, approximately ten months after the deadlines set forth in both the Purchase Order and the AS SOLD offer. (Def.'s L.R. 56(a)2 Stmt. ¶ 18.) According to Hamlin, "the Equipment was still not operational at that time because Bedeschi failed to deliver the computer program and related components to make the plant operational." (ECF No. 59-1, Declaration of Robert Hamlin ("Hamlin Decl.") ¶ 22.) Bedeschi asserts—and ASI denies—that "[t]he Equipment was ultimately manufactured and delivered . . . in accordance with Bedeschi's responsibilities under the AS SOLD offer and the Purchase Order" (Pl.'s L.R. 56(a)1 Stmt. ¶ 18; Def.'s L.R. 56(a)2 Stmt. ¶ 18) and that "[t]he delivery was final by the middle of September, 2013." (Pl.'s L.R. 56(a)1 Stmt. ¶ 19.) In September 2013, Bedeschi invoiced ASI for the remaining 80% of the Purchase Price. (Pl.'s L.R. 56(a)1 Stmt. ¶ 21; Def.'s L.R. 56(a)2 Stmt. ¶ 21.) ASI did not pay, and on October 17, 2013, Bedeschi sent ASI a "Non-Payment Notice" seeking full payment. (Pl.'s L.R. 56(a)1 Stmt. ¶ 21.) ASI denies that it was obligated to pay the remaining 80% of the Purchase Price upon delivery of the Equipment, arguing that under the Purchase Order, it had the right to inspect and reject goods that were not fit for their intended purpose; could seek a reduction in price for goods not accepted; and was entitled to

indemnification from Bedeschi for any liabilities it incurred due to defective materials or breach of warranties. ASI also argues that, under the Purchase Order, it was obligated to make payment only after it had inspected and accepted the Equipment. (Def.'s L.R. 56(a)2 Stmt. ¶¶ 16, 19, 21.) In a letter dated October 28, 2013, Leidos indicated that it would "back-charge" ASI $7,106.23 for repairs to the Equipment, and that it refused to accept the Equipment as of that date. (Hamlin Decl. ¶ 26.)

ASI finally paid Bedeschi $580,000 "as a proposed partial payment for the Equipment." (Pl.'s L.R. 56(a)1 Stmt. ¶ 22.) ASI sought to condition payment of the remaining $205,800 on the Equipment being operational, and requested that Bedeschi execute a "Conditional Waiver and Release Upon Partial Payment" (the "Release"). (Pl.'s L.R. 56(a)1 Stmt. ¶ 22; Def.'s L.R. 56(a)2 Stmt. ¶ 22.) Bedeschi responded to the proposed partial payment by letter dated October 31, 2013, and explained that Bedeschi would be willing to accept the partial payment, but would not sign the Release. (Pl.'s L.R. 56(a)1 Stmt. ¶ 23; Def.'s L.R. 56(a)2 Stmt. ¶ 23.) The letter also stated that the parties' agreement "did not contain a provision which allowed ASI to withhold payment of the unpaid balance until the Equipment was operational." (Pl.'s L.R. 56(a)1 Stmt. ¶ 23; Def.'s L.R. 56(a)2 Stmt. ¶ 23.) Nevertheless, Bedeschi proposed that ASI escrow the $205,800 and pay Bedeschi out of the escrow account once the Equipment was operational. (Pl.'s L.R. 56(a)1 Stmt. ¶ 23; Def.'s L.R. 56(a)2 Stmt. ¶ 23.) The letter set a deadline of November 4, 2013, for ASI to make a decision. (Pl.'s L.R. 56(a)1 Stmt. ¶ 23; Def.'s L.R. 56(a)2 Stmt. ¶ 23.) After receiving no response, Bedeschi followed up with another letter to ASI, dated November 14, 2013. (Pl.'s L.R. 56(a)1 Stmt. ¶ 24; Def.'s L.R. 56(a)2 Stmt. ¶ 24.) This letter repeated the points in the October letter, and stated "that if ASI did not indicate soon that the $580,000.00 check was sent in error, [Bedeschi] would deposit the check and insist on full

payment of the remaining $205,800.00." (Pl.'s L.R. 56(a)1 Stmt. ¶ 24; Def.'s L.R. 56(a)2 Stmt. ¶ 24.) On November 14, Hamlin responded to the letter by e-mail to Turano explaining that: ASI would not require the execution of the Release, Bedeschi should feel free to deposit the $580,000.00 check, and ASI would not escrow the remaining money. Hamlin ended his email with the statement, "Let's get the unit operational so we all feel comfortable." (Pl.'s L.R. 56(a)1 Stmt. ¶ 25; Def.'s L.R. 56(a)2 Stmt. ¶ 25.)

Bedeschi deposited the check for $580,000, and continued to demand payment of the $205,800 balance. (Hamlin Decl. ¶ 27.) ASI advised Bedeschi that Leidos had not accepted the Equipment and advised Bedeschi to "get the Equipment operational." (Hamlin Decl. ¶ 28.) The Equipment became operational in January 2014. (Pl.'s L.R. 56(a)1 Stmt. ¶ 27; Def.'s L.R. 56(a)2 Stmt. ¶ 27.) Bedeschi initiated this action by filing its complaint on March 30, 2014. (*See* Compl., ECF No. 1.) ASI then "filed a third-party complaint against Leidos on the basis that money claimed by Bedeschi was being withheld from ASI by Leidos." (Hamlin Decl. ¶ 30.) On July 18, 2014, Leidos indicated that it was accepting the Equipment, and any payment it was withholding from ASI was unrelated. (Hamlin Decl. ¶ 32.) On the same day, ASI voluntarily dismissed Leidos as a third-party defendant in this action. (ECF No. 38.) On July 25, 2014, Hamlin sent Turano a letter and a check for $162,193.77, and explained that ASI had backcharges against the $205,800 balance. (Pl.'s L.R. 56(a)1 Stmt. ¶ 28; Def.'s L.R. 56(a)2 Stmt. ¶ 28.) Specifically, ASI withheld following amounts from the balance: $7,106.23 back-charged by Leidos for costs to repair the Equipment; $9,000 for ASI's internal engineering and procurement efforts attempting simultaneously to expedite and mitigate the impact of Bedeschi's untimely performance; $17,500 for a fact-finding trip to Bedeschi's facility in Italy to ascertain the status of the order; and damages to the business relationship between ASI and Leidos due to

Bedeschi's late delivery, estimated at $10,000. (Hamlin Decl. ¶ 34.) Bedeschi rejected the check for $162,193.77 and maintained that ASI owed the full amount of $205,800. (Pl.'s L.R. 56(a)1 Stmt. ¶ 29; Def.'s L.R. 56(a)2 Stmt. ¶ 29.) On October 8, 2014, Bedeschi obtained an affidavit from William A. Kelsey—an employee of Leidos—which stated that Leidos had accepted the Bedeschi equipment and paid ASI in full, and was not withholding money or asserting any claims against ASI related to the Equipment. (Affidavit of William A. Kelsey, ECF No. 53.) On November 10, 2014, Hamlin sent Turano a letter and a check for $205,800, which was the amount Bedeschi had maintained it was owed.[2] (Pl.'s L.R. 56(a)1 Stmt. ¶ 30; Def.'s L.R. 56(a)2 Stmt. ¶ 30.) Although Leidos has not asserted claims for liquidated damages, late charges, or penalties against ASI related to the Equipment, it has not paid ASI in full. (Def.'s L.R. 56(a)2 Stmt. ¶ 36.) ASI initiated a lawsuit against Leidos on June 1, 2015, to recover $147,939.34 that Leidos still owed ASI. (Def.'s L.R. 56(a)2 Stmt. ¶ 31.)

### B.     Bedeschi's Complaint

Bedeschi's complaint provides the following description of its breach of contract claim: (1) Bedeschi and ASI entered into a valid and enforceable contract for the purchase of the Equipment (ECF No. 1, Compl. ¶ 33); (2) under the contract, ASI was required to pay Bedeschi 10% of the Purchase Price as a down payment, 10% of the Purchase Price upon the delivery of certain certified drawings, and 80% of the Purchase Price upon delivery of the Equipment (*id*. ¶ 14); (3) ASI did, in fact, pay 10% of the Purchase Price as a down payment and 10% of the Purchase Price upon Bedeschi's delivery of certain certified drawings (*id*. ¶ 19); (4) the Equipment was manufactured and delivered according to the contract (*id*. ¶ 35); and (4) ASI

---

[2] Bedeschi has an outstanding claim for attorneys' fees. The Purchase Order includes a provision allowing the prevailing party to recover attorneys' fees.

failed to pay the full 80% balance (*i.e.*, it still owes $205,800), which breached the parties' contract and caused Bedeschi damages. (*Id.* ¶¶ 35-37.) Bedeschi did not amend its complaint or file a reply brief.

## II.     LEGAL STANDARD

Summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (citation omitted). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (internal quotation marks and citation omitted). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) (internal citations and quotation marks omitted). "[T]he court must assess the record in the light most favorable to the non-movant and . . . draw all reasonable inferences in [the non-movant's] favor." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (internal quotations and citations omitted).

## III.    DISCUSSION[3]

---

[3] The provision in the Purchase Order governing disputes states that, "[i]f no Prime Contract's dispute resolution provision governs, the dispute shall be resolved by litigation in the Circuit

**A. Count One – Breach of Contract**

Bedeschi argues that the parties' contract required that ASI pay Bedeschi the outstanding balance of 80% of the Purchase Price of the Equipment upon delivery, and that ASI "clearly breached" the agreement by failing to do so before Bedeschi filed suit in March 2014. (Pl.'s Brief, ECF No. 50 ("Pl.'s Br.") at 9-10.)

There is a genuine issue of material fact as to which payment provisions govern the parties' agreement and whether ASI breached those provisions by failing to pay Bedeschi promptly after delivery. The Purchase Order, which is signed by both parties, states that "KC-69 rev02 pg. 1-18" forms a part of the Purchase Order and is "attached hereto." (ECF No. 59-2.) Pages 1-18 of the AS SOLD offer exclude the Sales Conditions, suggesting that the payment schedule of "10% Down with the Purchase Order," "10% Upon our delivery of certified drawings," and "80% Upon the delivery of the equipment (FOB Plainfield, Connecticut)" (ECF No. 1-1 at 21; ECF No. 52 at 28) was not part of the parties' agreement. But it is not clear from the record which, if any, documents were *actually* attached to the Purchase Order when the parties signed it. Further, the parties' conduct—specifically ASI's payment of the first two 10% installments in accordance with the schedule set forth in the "Payment" condition on page 20 of the AS SOLD offer, as well as Bedeschi's demand for the remaining 80% upon delivery in

---

Court of Yellowstone County, Montana. Montana law shall govern such disputes." (Def.'s Ex. B, ECF No. 59-2 at 5.) The Prime Contract is not in the record, and neither party has challenged venue in this Court or the application of Connecticut law to this dispute. (*See* Compl., ECF No. 1; Answer, ECF No. 18; Defendant's Opposition Brief, ECF No. 58 ("Def.'s Opp. Br.") at 9.) Bedeschi asserts that Conn. Gen. Stat. § 42-158m "dictates that Connecticut is the proper forum for adjudication of any disputes related to the construction contract and requires that Connecticut law be applied to the same." (Compl., ECF No. 1 ¶ 6.) While it is not clear that the parties' contract is a "construction contract," neither party has briefed these issues or argued against the application of Connecticut law. Therefore, I proceed on the parties' assumption that Connecticut law applies.

September 2013—suggests that the parties intended to follow the 10%-10%-80% payment provision. In short, there is a genuine dispute about which payment provisions govern the parties' agreement: the Sales Condition stating that ASI owed Bedeschi "80% of the Purchase Price upon delivery" (Pl.'s L.R. 56(a)1 Stmt. ¶ 11; Def.'s L.R. 56(a)2 Stmt. ¶ 11) or the provision from the Purchase Order, which states that "[p]ayment shall be made by Buyer only after . . . inspection and acceptance of the materials, equipment work or goods . . . ." (Def.'s Ex. B, ECF No. 59-2 at 4.)

In addition, ASI's conduct—making partial payment and seeking to condition payment of the remaining $205,800 on the Equipment being operational—suggests that there is a factual dispute concerning whether ASI accepted the Equipment after delivery, and was therefore obligated to pay Bedeschi under the Purchase Order before Bedeschi filed this action.

Because there is not enough evidence in the record to make clear which payment terms governed the parties' agreement, and whether ASI actually accepted the Equipment before this lawsuit was filed, Bedeschi has not met its burden of showing that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. Therefore, I deny summary judgment to Bedeschi on Count One.

### B.  Count Four – Violation of CUTPA

Bedeschi argues that "ASI's trumped up excuses not to pay Bedeschi were intentionally false and misleading" and were "unethical, oppressive, and unscrupulous" such that ASI violated CUTPA. (Pl.'s Br. at 10-13.) CUTPA provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42–110b(a). "Any person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or

11

practice prohibited by section 42-110b, may bring an action" under CUTPA. Conn. Gen. Stat. Ann. § 42-110g(a). A practice is considered unfair if (1) it "offends public policy"; (2) "it is immoral, unethical, oppressive, or unscrupulous"; (3) or "it causes substantial injury to consumers. . . . A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Ramirez v. Health Net of Ne., Inc.*, 285 Conn. 1, 19 (2008). (citations omitted).

As stated above, there is a genuine issue of material fact as to whether ASI breached the parties' contract. But even if it did, that alone would not be enough for a CUTPA claim. "A simple breach of contract does not offend traditional notions of fairness and, standing alone, does not offend public policy so as to invoke CUTPA. A CUTPA claim lies where the facts alleged support a claim for more than a mere breach of contract." *Piao v. Smith*, No. 3:11CV1853 HBF, 2014 WL 7270290, at *13 (D. Conn. Dec. 18, 2014) (citation omitted). Bedeschi has not met its burden of showing, as a matter of law, that ASI's excuses for failing to make full payment were "intentionally false and misleading" such that ASI violated CUTPA. Therefore, I deny summary judgment to Bedeschi on Count Four.

## IV. CONCLUSION

For the foregoing reasons, the Court DENIES Plaintiff's motion for summary judgment. (ECF No. 49.)

IT IS SO ORDERED.

/s/
Michael P. Shea, U.S.D.J.

Dated:      Hartford, Connecticut
            March 25, 2016